UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| HUTCHINS & HUTCHINS, INC., | ) |
| Plaintiff, | ) Case No.: 2:23-cv-67 |
| v. | ) |
| | ) DEMAND FOR JURY TRIAL |
| AIRBOSS DEFENSE GROUP, LLC, | ) |
| Defendant. | ) |

**Serve:**
AirBoss Defense Group, LLC
c/o Registered Agent
Corporation Service Company
100 Shockoe Slip, Fl 2
Richmond, VA 23219-4100

# COMPLAINT

NOW COMES the Plaintiff, Hutchins & Hutchins, Inc. ("H&H"), by counsel, for its Complaint against the Defendant, AirBoss Defense Group, LLC ("ADG"), and in support states the following:

## The Parties

1. H&H is a Virginia stock corporation with its principal place of business at 39 Hutchwood Ln, Waynesboro, VA 22980.

2. ADG is a Delaware limited liability company with its principal place of business at 7100 Holladay Tyler Rd, Glenn Dale, MD 20769.

## Subject Matter Jurisdiction

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy, excluding interest and costs, exceeds $75,000.

1

## Personal Jurisdiction

4. Personal jurisdiction over ADG exists in Virginia because, among other reasons, ADG conducts business in Virginia and has a registered agent in Virginia.

## Venue

5. Venue is proper in this Court because, among other reasons, it is a permissible venue under 28 U.S.C. § 1391 as a district in which ADG is subject to personal jurisdiction.

## Statement of Facts

*H&H's Business*

6. H&H is a distributor of products designed for and used in healthcare settings and controlled clean room environments. It also contracts with federal, state, and local government agencies for the sale of medical supplies, equipment, and devices.

7. To successfully conduct its business, H&H has authorized distributor relationships with manufacturers of various kinds of healthcare and controlled clean room environment supplies and equipment. One of the businesses H&H is an authorized distributor for is O&M Halyard, Inc. ("Halyard"). Upon information and belief, Halyard is a Georgia corporation that, among other things, manufactures and distributes personal protective equipment in the healthcare space and other related industries.

8. In its authorized distributor arrangement with Halyard, H&H purchases Halyard's products and resells them to interested purchasers. H&H also brokers negotiations between Halyard and interested purchasers of Halyard's products and routinely manages the logistics and performance of deals reached between Halyard and purchasers.

9. For example, between the months of September of 2020 and March of 2021, H&H brokered and managed an approximately $9,500,000 contract between Halyard and a third-party

company involving the purchase and distribution of Halyard respirators. For its work on this contract, H&H earned a gross revenue of 14 percent of the approximately $9,500,000 sale, or roughly $1,330,000.

*The Parties Enter into a Non-Disclosure Agreement*

10. Through use of online systems to track government contracting awards, H&H learned that ADG was awarded a contract with the United States federal government for the supply of nitrile gloves (the "Federal Contract").

11. On or about April 26, 2021, H&H Sales Operations Manager, Steve Cason, called ADG to inform them H&H could assist ADG in its ability to meet its obligations under the Federal Contract, to which ADG indicated it would be interested in that sort of business relationship.

12. Cason informed H&H President, Jay Stotlar, about the potential business opportunity that arose from his phone call with ADG. Stotlar then followed up on that opportunity by emailing ADG Chief Strategy Officer, John Johns, on or about April 28, 2021, to determine whether ADG would be interested in having H&H introduce ADG to manufacturers who could supply it with the nitrile gloves it was required to distribute under the Federal Contract.

13. On or about April 29, 2021, Johns responded that ADG was interested in Stotlar's proposal and set up a videoconference with various representatives of ADG and H&H to discuss the proposal further.

14. The parties' negotiations initially bore promise of a fruitful, mutually beneficial relationship. Within these negotiations, the parties on April 29, 2021, executed a mutual Non-Disclosure Agreement that was drafted by ADG (the "NDA"). *See* attached **Exhibit A**. The parties entered into the NDA to govern their disclosure of "certain proprietary and confidential

information to each other in connection with the potential supply of nitrile gloves and related products" pursuant to the Federal Contract. *See* Ex. A ¶ A.

15. In the NDA, the parties agreed that "Confidential Information" meant, among other things, "all commercial, business and technical information disclosed by . . . one party (the "Disclosing Party") to the other party (the "Receiving Party")" and would include any "information concerning customers or suppliers" of either party. *See* Ex. A ¶ 1. The parties agreed that, among other obligations, they would "keep such Confidential Information confidential" and "use such Confidential Information only for the Purpose" identified in Paragraph A of the NDA. *See* Ex. A. ¶¶ A, 3(a), (b).

16. Additionally, in paragraph 10 of the NDA, the parties agreed to the following:

> The Party ("Beneficiary Party") receiving the benefit of an introduction to another person or business opportunity from the other Party ("Intermediary Party") agrees that the Beneficiary Party . . . shall not, directly or indirectly, during the term hereof, enter into any agreement association, partnership, joint venture or other transaction for the purpose of developing any business opportunity with any such other person introduced by the Intermediary Party to the Beneficiary Party or otherwise pursue or take advantage of any business opportunity introduced by the Intermediary Party *without the prior written consent of the Intermediary Party* except to the extent that the Beneficiary Party has an existing relationship with such entity, as evidenced by its records.

Ex. A. ¶ 10 (emphasis added).

17. In the event of any breaches of the NDA by the Receiving Party, the parties agreed in, paragraph 11, that:

> The Receiving Party agrees to indemnify the Disclosing Party from and against any and all losses suffered or incurred by the Disclosing Party as a result of or arising directly or indirectly out of or in connection with any breach of the obligations and limitations on use created or arising under this Agreement by the Receiving Party. . . .

4

18. The parties' obligations under the NDA became effective as of April 29, 2021, and "terminate on the date that is five (5) years from the last date Confidential Information is disclosed from on Party to the other . . . ." Ex. A. ¶ 12.

*H&H Introduces ADG to Halyard*

19. In the parties' discussions on April 29, 2021, H&H informed ADG it had authorized distributor relationships with several different companies that could supply ADG with the nitrile gloves required by the Federal Contract, including Halyard. In response, ADG indicated it was interested in utilizing Halyard's nitrile gloves for the Federal Contract.

20. On or about May 3, 2021, H&H introduced ADG to Halyard through a videoconference meeting set up by H&H. In that same meeting, representatives of the three companies also discussed arrangements with each other to help ADG meet its obligations under the Federal Contract as well as potential future government contracts.

*ADG Engages in Business with Halyard Without H&H's Written Consent*

21. Upon information and belief, ADG did not purchase or otherwise use Halyard's products pursuant to the Federal Contract.

22. Nonetheless, ADG used its introduction to Halyard to its advantage. Indeed, H&H learned that, without H&H's consent (written or otherwise), ADG had contacted Halyard in March of 2022 and negotiated a direct, lucrative sale for the purchase of nitrile gloves at a price of approximately $13,400,000 (the "March 2022 breach"). Upon information and belief, ADG committed the March 2022 breach pursuant to a contract other than the Federal Contract (the "Offending Contract").

23. Upon information and belief, no vendor other than Halyard had nitrile gloves that met the standards and specifications required by the Offending Contract, and ADG had no other

choice but to purchase Halyard nitrile gloves to meet its obligations under the Offending Contract. And had ADG followed its obligations under paragraph 3(b) and paragraph 10 of the NDA and notified H&H of its need for Halyard nitrile gloves, H&H would have brokered a transaction between Halyard and ADG and earned substantial proceeds from that transaction.

## COUNT I
## BREACH OF CONTRACT

24. H&H repeats and re-alleges its allegations in all the preceding paragraphs as if fully stated in this section of the Complaint.

25. The parties entered into the NDA to govern their disclosure of "certain proprietary and confidential information to each other in connection with the potential supply of nitrile gloves and related products for the U.S. Government" pursuant to the Federal Contract. *See* Ex. A ¶ A. It was for this purpose, and this purpose "only," that ADG was permitted to use any confidential information during the term of the NDA. Ex. A ¶¶ A, 3(b).

26. Furthermore, under paragraph 10 of the NDA, ADG had an obligation to not enter into any agreement or transaction with any business introduced to it by H&H "without the prior written consent of" H&H. This obligation also lasted through the term of the NDA. Ex. A ¶¶ 10, 12.

27. Prior to the execution of the NDA, ADG had no business relationship with Halyard. ADG was unaware of the existence or details of H&H's authorized distributor relationship with Halyard, which was information that fell within the NDA's definition of "Confidential Information." *See* Ex. A ¶ 1. Nonetheless, ADG used this Confidential Information to its advantage, pursued lucrative business opportunities with Halyard without H&H's written consent, and ultimately secured a roughly $13,400,000 contract with Halyard through the March 2022 breach.

28. The March 2022 breach constituted violations of ADG's obligations under paragraph 3(b) and paragraph 10 of the NDA.

29. As a result of ADG's breach, H&H has been damaged in the amount of at least $1,876,000.

WHEREFORE, H&H, by counsel, respectfully requests that this Court enter judgment against ADG as follows:

1. Compensatory and consequential damages in the amount of $1,876,000;

2. Attorneys' fees and costs, as provided under the Paragraph 11 of the NDA;

3. Pre-judgment interest; and

4. Any additional relief this Court deems just and equitable.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38, the plaintiff demands a trial by jury.

Respectfully Submitted,

**HUTCHINS & HUTCHINS, INC.**

By: /s/ Christopher D. Davis
      Of Counsel

Christopher D. Davis (VSB No. 74809)
Justin R. Burch, Esq. (VSB No. 92135)
Davis Law, PLC
555 Belaire Avenue, Suite 340
Chesapeake, VA 23320
Tel: (757) 410-2293
Fax: (757) 257-8614
chris@davislawplc.com
justin@davislawplc.com
*Counsel for Plaintiff*