UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

HUTCHINS & HUTCHINS, INC.

      Plaintiff,

v.                                                      No.  2:23-cv-67

AIRBOSS DEFENSE GROUP, LLC,

      Defendant.

## OPINION AND ORDER

In this contract dispute involving an alleged breach of a Non-Disclosure Agreement ("NDA"), Airboss Defense Group, LLC, moved in limine to exclude expert testimony relating to (1) the total amount of damages and the calculation of such damages resulting from the alleged breach, (2) the opinions set forth in expert witness Roland Davis's ("Davis") supplemental report using the "Lehman Formula," and (3) Davis's testimony on the applicable gross profit margin. Mem. Supp. Def.'s Mot. in Lim. ("Def.'s Mem.") (ECF No. 80, at 7, 10, 13). On September 4, 2024, the Court held a hearing on Defendant ADG's Motion in Limine to Exclude Testimony of Plaintiff's Damages Expert, Roland Davis. (ECF No. 79). Justin Burch, Esq., and Nathan Hernandez, Esq., appeared on behalf of Plaintiff Hutchins & Hutchins, Inc. ("H&H"). Andrew Bosse, Esq., Ashley Racette, Esq., and Lawrence Murphy, Esq., appeared on behalf of Defendant Airboss Defense Group ("ADG").

As explained below and at the hearing, the Court GRANTS in part and DENIES in part ADG's Motion in Limine. The Court granted in part ADG's motion to exclude testimony by Davis about the total amount of damages and the calculation of such damages, as well as any of the opinions set forth by Davis in the supplemental report using the Lehman Formula. The Court also

1

denied in part ADG's motion to exclude testimony relating to the applicable gross profit margin, excluding Davis's proffered testimony equating the gross profit margin to a "finder's fee," but allowing his testimony on gross profit margins generally and with respect to a transaction involving personal protective equipment in the relevant industry.

## I.   BACKGROUND

In March 2021, United States Department of Health and Human Services ("DHHS") awarded ADG a contract to supply 18,200,000 boxes of nitrile gloves by March 15, 2022. Am. Compl. (ECF No. 63, ¶¶ 11, 13). Under the contract, the government would pay ADG $12.98 per box of gloves and transportation costs of $2.85 per box. Id. ¶ 13. The total contract price was $288,106,000. Id. Shortly after the contract award, H&H, which represented various glove manufacturers, contacted ADG, and offered to assist ADG in meeting its obligations under the contract. Compare Am. Compl. (ECF No. 63, ¶¶ 15-26), with Answer (ECF No. 66, ¶¶ 15-26). During these discussions, parties considered "broader business opportunities," Def.'s Mem. (ECF No. 80, at 3), as well as how H&H "could assist ADG fulfill its obligations under the Federal Contract by making introductions to distributors . . . ." Mem. Opp'n Def.'s Mot. Preclude Pl.'s Damages Expert Roland Davis ("Pl.'s Mem. Opp'n") (ECF No. 85, at 2). Specifically, H&H arranged meetings between ADG and the glove manufacturer, Halyard. Id.

As part of these discussions, on April 29, 2021, the two parties entered into an NDA prepared by ADG. Compare Am. Compl. (ECF No. 63, ¶¶ 28, 29), with Answer (ECF No. 66, ¶¶ 28, 29). The parties dispute the purpose and meaning of the NDA. Compare Am. Compl. (ECF No. 63, ¶¶ 27-39), with Answer (ECF No. 66, ¶¶ 27-39). H&H alleges that the NDA was to protect its role in any future transaction. Pl.'s Mem. Opp'n (ECF No. 85, at 2). It claims that "the parties understood that if ADG was to enter into a transaction with a manufacturer H&H introduced to

ADG, H&H would be involved in the transaction and compensated for its involvement," Am. Compl. (ECF No. 63, ¶ 27). For its part, ADG claims that the NDA merely governed the disclosure of confidential information related to the "broader business opportunities" which were never pursued. Answer (ECF No. 66, ¶¶ 28-30). The defined "Purpose" of the NDA was to permit the parties to "disclose certain proprietary and confidential information to each other in connection with the potential supply of nitrile gloves and related products for the U.S. Government." Am. Compl. (ECF No. 63-A, § A). But, the NDA also included an express "non-circumvention" provision stating that a Beneficiary Party introduced "to another person or business opportunity from the other Party" is prohibited from entering into an agreement with that introduced person "for the purpose of developing any business opportunity . . . without the prior written consent of the Intermediary Party." Id. (ECF No. 63-A, § 10(a)).

The negotiations which H&H facilitated between Halyard and ADG were initially unsuccessful and ADG purchased nitrile gloves from two other companies. Id. ¶¶ 48-49. But, in March 2022, ADG and Halyard entered into a contract for the purchase of nitrile gloves to fill a gap in deliveries from one of ADG's other vendors. Id. ¶¶ 7, 71. The company did not include H&H in its March 2022 deal with Halyard or obtain H&H's permission to conclude any purchase of nitrile gloves. Id. ¶¶ 69-73. Because H&H "introduced" Halyard to ADG, and because ADG contracted with Halyard without first obtaining H&H's written consent, the company alleges ADG violated the NDA's non-circumvention provision and deprived H&H of profits it would have otherwise received through a finder's fee or a resale. Id. ¶¶ 22-26, 40-47, 74-75, 88-102.

In February 2023, H&H brought the present breach of contract action against ADG, originally seeking $1,876,000 in compensatory and consequential damages. Compl. (ECF No. 1, ¶ 29). H&H amended its complaint on February 23, 2024, seeking monetary damages and

3

injunctive relief.  Am. Compl. (ECF No. 63, ¶ 102).  H&H then retained Roland Davis ("Davis") as an expert witness on damages flowing from the alleged breach.  Pl.'s Mem. Opp'n (ECF No. 85, at 3).

A.      Roland Davis's Expert Reports

Davis is a purported expert in "business appraisals and valuations, industry and custom in government contracting, procurement of sales opportunities and associated compensation, and pricing models."  Def.'s Mem. (ECF No. 80-1, at 1).  Davis serves as President of Davis Business Appraisers, Inc., where the company provides consulting services, business valuations, and machinery and equipment appraisals.  Id. (ECF No. 80-2, at 10).  Davis's other qualifications include: "[o]wnership of a software and hardware technology corporation which sold products to Federal Government Agencies directly and through Prime Contractors as a wholesaler[,] . . . 20 Years of Confidential M&A Sales as an intermediary with transaction experience selling Federal Government Contractors[,] . . . [and] 9 Years of Business Valuation Appraisal of Private corporations inclusive of Government Contractors and wholesalers."  Id. (ECF No. 80-2, at 7).

Davis produced his first expert report on September 1, 2023.  Id.  He provided two opinions in this report.  Id. (ECF No. 80-2, at 2-3).  In his first opinion, Davis opined on a reasonable profit margin H&H would expect to realize as an intermediary on the Haylard glove purchase by ADG.  Id. (ECF No. 80-2, at 2).  He reviewed past sales and relied on a large transaction ("the Waterstone Transaction") between H&H and Halyard where H&H purchased the personal protective equipment from Halyard and resold them at a markup to Waterstone Healthcare, LLC.  Id.  In the various invoices comprising the Waterstone Transaction, H&H realized an 11.4%-13.4% gross margin.  Id.  Davis also compared the gross profit margin range in the Waterstone Transaction to margins reported in two industry sources: Biziminer's June 2023 Industry Financial Profile for

4

Medical, Dental, Hospital Equipment, and Supplies Merchant Wholesalers (NAICS 423450) and a DealStats financial report for NAICS 423450 wholesalers. Id. The Biziminer's source revealed that the average gross margin for intermediary companies comparable to H&H was 27.15% in 2021 and 26.46% in 2022. Id. The DealStats financial report compiled data from December 4, 1998, to December 28, 2018, for Medical, Dental, Hospital Equipment, and Supplies Merchant Wholesalers with a net annual revenue between $5 million and $25 million and revealed that the median gross profit margin for such wholesalers was 41.1%. Id.

Davis opined that an 11.4%-13.4% gross margin from the ADG and Halyard transaction would have been "reasonable by the relevant industry standards" because the Waterstone Transaction gross margin "is well below Industry Standard Gross Margins." Id. With little additional analysis, he further opined that such a gross margin would have been "applicable, reasonable, and below industry standards . . . regardless of whether that Gross Margin resulted via resale or by virtue of a finder's fee." Id.

In Davis's second opinion, he opined that ADG would have expected that H&H would have benefited from the transaction between ADG and Halyard given the NDA, either through a resale of the product or through a finder's fee. Id. (ECF No. 80-2, at 3). Davis relied on his experience as an M&A and Business Valuation Appraiser observing similar transactions and industry norms to inform his opinion. Id. He also relied on his previous personal experience as an owner of a government contracting company and wholesaler of product to opine on the subject. Id.

On February 7, 2024, Davis supplemented his first expert report with a second report, rebutting ADG's expert. Id. (ECF No. 80-3, at 2-6). In this supplemental report, Davis "opine[d] on accepted industry standards for calculating finder's fees paid to intermediaries who bring

5

businesses together and/or facilitate multimillion dollar commercial transactions between them." Id. (ECF No. 80-3, at 1). Specifically, Davis opined that the "Lehman Formula" represents a standard method for calculating finder's fees, although it is "often used in the mergers and acquisitions context." Id. (ECF No. 80-3, at 3). Davis also noted that "based on the representations of counsel, it is my understanding that it has been relied upon by courts from other jurisdictions in calculating finder's fees paid to an injured party who brought companies together." Id. (ECF No. 80-3, at 4). Applying the Lehman Formula, Davis calculated a "finder's fee" of $227,400 with respect to the March 2022 nitrile glove transaction between ADG and Halyard. Id. (ECF No. 80-3, at 5).

Finally, Davis submitted two surrebuttal reports dated October 13, 2023, and June 25, 2024. Id. (ECF No. 80-4); id. (ECF No. 80-5). These reports did not modify any of Davis's prior opinions but responded to issues previously raised by ADG's expert. Id. (ECF No. 80-4); id. (ECF No. 80-5, at 1) ("All opinions I provided in prior reports remain unchanged."). On July 9, 2024, ADG's counsel deposed Davis. Id. (ECF No. 80-6). As relevant to the Court's rulings, Davis clarified the scope of his testimony in deposition, expressly stating that he would not be applying his gross profit margin opinion to any final calculation of damages. Def.'s Mem. (ECF No. 80-6, 31:21-32:13) ("Davis Dep."). He also stated that his use of the Lehman Formula to determine an alternate value for the finder's fee was urged on him by counsel and not something he independently would apply to a wholesale transaction like ADG's glove purchase from Halyard. Id. 95:17-96:2.

**B.    Current Motion**

ADG moved to exclude Davis's testimony in its entirety. The company first argues that Davis should be precluded from opining on an amount of damages because Davis's expert report

does not include an opinion as to the total dollar amount of damages, and because Davis admitted in his deposition that he was not retained to provide a complete damages analysis. Def.'s Mem. (ECF No. 80, at 1, 7-9). ADG also moved to exclude Davis's opinions in his supplemental report, namely his use of the Lehman Formula. Id. at 1, 10. It asserts that Davis expressly disavowed the use of the Lehman Formula during his deposition, and therefore, should not be permitted to offer this opinion at trial. Id. at 10-11.

ADG also moved to exclude testimony on the applicable gross profit margin, claiming that Davis's opinion is not based on sufficient facts or data, is not the product of reliable principles and methods, and is based on cherry-picked data. Id. at 1, 13-20. ADG argues that Davis did not properly support his conclusion that a finder's fee transaction and a resale transaction would result in the same, reasonable, and below industry standard gross profit margin. Id. at 13. Because Davis relied on a single precedent transaction and the industry data he cited was overbroad, ADG argues that Davis's gross profit margin opinion is unreliable. Id. at 13-15, 17-18. Finally, ADG argues that Davis reached several impermissible legal conclusions in his opinions, opining on ADG's expectations when entering into the NDA and agreeing to the non-circumvention provision. Id. at 23-25.

H&H opposed ADG's motion. Pl.'s Mem. Opp'n (ECF No. 85). H&H claims that ADG's argument that Davis should be precluded from testifying about the total calculation of damages raises a moot point, as "H&H has never once represented that Davis would offer an opinion on H&H's 'total dollar amounts of damages.'" Id. at 8. Instead, H&H explains that Davis's testimony on the industry standard for gross profit margins and finder's fees merely influences H&H's final damages calculation, hence why the total dollar amounts of damages were excluded from Davis's reports. Id. at 8-9. Additionally, H&H argues that Davis's testimony on the Lehman Formula is

admissible because the opinion has been offered as an alternate opinion on industry standard finder's fees and that Davis would "never rule out" any of his opinions. Id. at 12; Davis Dep. 100:23-24. H&H also claims that Davis provided his Lehman Formula opinion in part because of H&H's difficulties obtaining ADG's per box commission paid to intermediaries in similar sales in the past. Pl.'s Mem. Opp'n (ECF No. 85, at 11).

Finally, H&H rebuts ADG's argument regarding the applicable gross profit margin by arguing that Davis used sufficient facts and data and that his opinion is the product of reliable principles and methods. Id. at 14-20. More specifically, H&H argues that testimony based on personal experience is permissible, and that Davis relied on such experience in combination with the Waterstone Transaction and the Bizminer and DealStats financial reports, providing reliable testimony. Id. at 20. H&H also argues that the fact that Davis did not own a medical distribution company is of no consequence, and that his experience "selling goods generally, valuating businesses, and dealing in complex transactions in the mergers and acquisitions context" adequately informs his opinions. Id. at 22. ADG replied, (ECF No. 86), and with the matter fully briefed, the parties appeared by counsel for oral argument on September 4, 2024.

## II.   STANDARD OF REVIEW

The purpose of a motion in limine is "to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." United States v. Verges, No. 1:13cr222, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014). "Questions of trial management are quintessentially the province of the district courts," United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006), and thus, the court has broad discretion when considering a motion in limine. See Kauffman v. Park Place Hosp. Grp, 486 F. App'x 220, 222 (4th Cir. 2012). A motion in limine to

exclude evidence "should be granted only when the evidence is clearly inadmissible on all potential grounds." Verges, 2014 WL 559573, at *3.

In determining the admissibility of expert witness testimony, Rule 702 of the Federal Rules of Evidence governs. United States v. Wilson, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert, 509 U.S. at 592).

The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." Id.; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597)); Oglesby v. General Motors Corp., 190 F.3d 244, 249-50 (4th Cir. 1999) ("[A] district judge, considering a proffer of expert testimony under Federal Rule of Evidence 702—whether based on scientific, technical, or other

9

knowledge—must, in determining its admissibility, ensure that the evidence is 'not only relevant, but reliable'" (quoting Daubert, 509 U.S. at 589)).   That is, "a reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby, 190 F.3d at 250 (4th Cir. 1999) (citing Daubert, 509 U.S. at 590, 592-93).   "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592 n.10).

Thus, the District Court serves as a gatekeeper to assess whether the proffered evidence is reliable and relevant. Kumho Tire Co., 526 U.S. at 141.   But the gatekeeper function does not require that the Court "determine that the proffered expert testimony is irrefutable or certainly correct" because expert testimony is "subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596).   There is no "mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, 'the test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Peters-Martin v. Navistar Int. Trans. Corp., 410 Fed. App'x 612, 617 (4th Cir. 2011) (quoting Wilson, 484 F.3d at 274) (internal citations and quotations omitted).

The text of Rule 702 explicitly contemplates experiential experts. Fed. R. Evid. 702 (listing "experience" as an expert qualification"); see also Fed. R. Evid. 702 advisory committee's note ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.").   "Purely scientific testimony . . . is characterized by 'its

10

falsifiability, or refutability, or testability.'" Wilson, 484 F.3d at 274 (quoting Daubert, 509 U.S. at 593). But experiential expert testimony does not "rely on anything like a scientific method," causing the district court's role in "examining the reliability of experiential expert testimony" to become "somewhat more opaque." Id. (citing Fed. R. Evid. 702 advisory committee's note). Nevertheless, the court's gatekeeping role "is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Cooper, 259 F.3d at 200 (citing Kumho Tire, Co., 526 U.S. at 152). Therefore, courts must still require an experiential expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note) (alterations in original).

### III.   ANALYSIS

**I.   Davis is Precluded from Opining on the Calculation of Damages or the Total Amount of Damages.**

In its opposition, H&H concedes that "H&H did not retain Davis to offer an opinion as to what H&H's 'total dollar amounts of damages' are or the calculation of those amounts . . . ." Pl.'s Mem. Opp'n (ECF No. 85, at 10). Further, H&H states that Davis "has not offered and will not offer an opinion as to what H&H's total damages are or any calculations of those total damages." Id. At the hearing, H&H again reiterated all of these representations. In addition, during Davis's deposition, he explained that "any calculations and damages were not in the scope of this assignment," and that he "wasn't assigned to calculate damages." Davis Dep. 32:12-13, 95:14-16.

Given H&H's assertions both in writing and at the hearing, the Court granted ADG's motion, precluding Davis from providing any opinion as to the total calculation of damages or the precise calculation of what H&H's damages would be. However, as outlined below, Davis will

11

be permitted to testify as to certain gross profit margin percentages, which—depending on other evidence—may be relevant to H&H's claimed damages. ADG's motion to exclude Plaintiff's expert witness testimony as it relates to the calculation of damages and the total amount of damages is therefore GRANTED in part.

## II.    Davis is Precluded from Opining About Finder's Fees Using the Lehman Formula.

ADG argues that Davis's use of the Lehman Formula to calculate a finder's fee must be excluded because Davis disavowed this opinion at his deposition. Def.'s Mem. (ECF No. 80, at 10). ADG also argues that Davis's Lehman Formula testimony should be excluded because the formula is most often used in the mergers and acquisitions context, not in transactions concerning the sale of personal protective equipment. Id. at 11. H&H argues that Davis's Lehman Formula testimony is admissible because by offering the Lehman Formula, he merely provides an alternative standard for calculating a finder's fee. Pl.'s Mem. Opp'n (ECF No. 85, at 10-11).

I agree with ADG. Davis did not adopt the use of the Lehman Formula as his own in providing his expert opinion. In his expert report, Davis explained that "based on the representations of counsel, it is my understanding that [the Lehman Formula] has been relied upon by courts from other jurisdictions in calculating finder's fees paid to an injured party who brought companies together." Def.'s Mem. (ECF No. 80-3, at 4). Davis admitted in his deposition that he was personally unaware of any transaction that used the Lehman Formula in connection with the sale of goods. Davis Dep. 94:25-95:5. Davis even went so far as to state: "I don't agree with applying the Lehman [F]ormula. I was only doing this because they wanted, hey, was there anything else out there that could be found. I didn't agree with this." Id. 95:17-96:2.

When an expert repudiates or disavows an opinion at deposition that was expressed in his expert report, such an opinion should be excluded. See, e.g., Mitchell v. Geo Group, Inc., No. CV-

19-4445, 2022 WL 874287, at *5 (D. Ariz. Mar. 24, 2022) (making a distinction between testimony difficult to reconcile with expert report and an expert repudiating or disavowing an opinion during deposition, requiring exclusion); Fabrizi v. Rexall Sundown, Inc., No. 1-289, 2004 WL 1202984, at *10 (W.D. Pa. June 2, 2004) ("[A]lthough [Dr. Roberts's] Expert Report claims to state an opinion . . . she repeatedly has disavowed the requisite knowledge and expertise to offer the same."). Davis offered this opinion because counsel believed it could serve as an alternative theory of damages, not because Davis believed the formula would provide an accurate finder's fee calculation in the sale of goods context. Rule 702 requires expert evidence to "assist the trier of fact to understand or to determine a fact in issue." See Daubert, 509 U.S. at 591. An expert merely repeating counsel's theory of damages would not be helpful to the trier of fact. Davis did not reach this conclusion by his own independent analysis. If his testimony were admitted solely on the basis of a lawyer's instruction, it would leave ADG without any ability to test the reliability of his opinion before the jury. Because Davis testified that the Lehman Formula was an inappropriate measure of damages, his expert opinion that the Lehman Formula could be used to calculate a finder's fee must be excluded. Accordingly, Davis is not permitted to testify about the Lehman Formula or opine on a finder's fee calculated using the Lehman Formula, and ADG's motion to exclude Plaintiff's expert witness testimony as it relates to the use of the Lehman Formula is GRANTED in part.

### III.   Davis's Opinions on the Gross Profit Margin as it Applies to an Intermediary in the Sale of Goods are Sufficiently Reliable under Federal Rule of Evidence 702.

ADG takes issue with several aspects of Davis's gross profit margin testimony as it applies to both a resale transaction and a transaction including a finder's fee, arguing that the testimony should be excluded as to both types of transactions. Def.'s Mem. (ECF No. 80, at 13). ADG also argues that Davis should be precluded from testifying about ADG's expectations surrounding the

transaction in entering into the NDA with H&H.  Id. at 23-25.  H&H counters by pointing to Davis's reliance on the Bizminer and DealStats data and other H&H transactions, and Davis's decades of experience selling products to government agencies and appraising and valuing businesses engaged in similar government contract work.  Pl.'s Mem. Opp'n (ECF No. 85, at 16-24).

For the reasons stated below, Davis is permitted to opine as to what an applicable, reasonable, and below industry standard gross profit margin would be with respect to a resale transaction.  However, Davis is precluded from testifying as to how this same gross profit margin calculation would apply to a transaction including a finder's fee.  Finally, Davis is precluded from opining on ADG's expectations in entering into the NDA with H&H.

A.     **Testimony About the Gross Profit Margin as it Relates to a Resale Transaction.**

Regarding Davis's resale transaction conclusion, ADG broadly asserts that Davis's testimony on the applicable gross profit margin must be excluded because Davis is not a qualified expert, his opinion is not based on sufficient facts or data, his opinion is based on both cherry-picked and overbroad data, and his testimony is not the product of reliable principles and methods.  Def.'s Mem. (ECF No. 80, at 13-17, 19-25).  H&H responds by claiming that Davis's opinion regarding the 11.4%-13.4% gross profit margin range for resale transactions is reliable because Davis looked beyond the Waterstone Transaction alone to calculate the range, he examined a variety of data in forming his conclusion, and he relied on his experience in forming his conclusion.  Pl.'s Mem. Opp'n (ECF No. 85, at 16-23).

First, ADG claims that Davis is not qualified to testify to the applicable gross profit margin as he lacks experience in the area of government contracts or the sale of medical supplies.  Id. at 22.  ADG further argues that, under Rule 702, expert testimony is only admissible when the

14

testimony is "the product of reliable principles and methods." Id. at 19 (citing Fed. R. Evid. 702(c)). ADG cites several factors it claims an expert's theory must meet, including: "(1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." Id. (quoting Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017)). But, as an experiential expert, Davis is not required to "'rely on anything like a scientific method.'" United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note). Rather, the question is whether Davis can "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Id. (quoting Fed. R. Evid. 702 advisory committee's note) (alterations in original); see also Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199-200 (4th Cir. 2001) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 152 (1999)).

Davis has significant experience as a business owner and appraiser. He evaluated, sold, and appraised wholesalers and became familiar with the terms of transactions similar to the present case over a period of many years. Def.'s Mem. (ECF No. 80-1, at 1; ECF No. 80-2, at 3, 7, 10). He previously owned a company that sold products to the federal government as a wholesaler, and has twenty years of experience of M&A sales with experience selling federal government contractors and nine years of experience valuing private corporations, including government contractors and wholesalers. Id. (ECF No. 80-2, at 7).

Davis properly cited this experience in support of his opinions. At the outset, his report explains that the following opinions were "based on [his] review of the documents above, literature, financial data given to [him] by H&H, and his education and experience." Id. (ECF No. 80-2, at 2). When asked for the basis of Davis's opinion that resale fees and finder's fees are two

15

common forms of compensation in the industry, Davis explained in his deposition that his experience as an "M&A . . . business valuation appraiser, confidentially selling and appraising wholesalers in the private . . . . market where [he has] observed similar transactions in where the industry norm has . . . became abundantly apparent to me as a broker and/or advisor" informed his opinion. Davis Dep. 60:17-60:23. In fact, Davis relied on his experience several times throughout his deposition, backing his responses to questions ranging from pricing to financial data. See Davis Dep. 47:1-48:5 (relying on experience to explain how companies set margins consistently for all items but vary when volume fluctuates); id. 48:6-15 (explaining how his experience looking at private financials is relevant); id. 80:18-25 (reiterating that his decades of experience informed his opinion on the relevant gross profit margin).

Further, Davis did not produce the 11.4%-13.4% gross profit margin range based on the Waterstone Transaction alone. In fact, as outlined in his report, Davis explained that his opinion about the gross profit margin range "is justified by two different sources." Def.'s Mem. (ECF No. 80-2, at 2). He cited a higher average gross profit margin percentage from companies comparable in size to H&H of 27.15% in 2021 and 26.46% in 2022 as revealed from the Bizminer's financial report to inform his opinion. Id. Because the Waterstone Transaction resulted in a lower gross profit margin than those listed in the Bizminer report, Davis concluded the 11.4%-13.4% gross profit margin is reasonable and below industry standard. Id. (ECF No. 80-2, at 2).

Additionally, he relied on the DealStats financial report to inform his conclusion. Id. This financial report examined wholesalers within NAICS code 423450, the same code H&H falls within, compiling data from December 4, 1998, to December 28, 2018. Id. Davis also limited the search to companies comparable in size to H&H. Id. This report revealed a much higher margin

of 41.1%, again prompting Davis to conclude that the lower range of 11.4%-13.4% is reasonable and below industry standard.  Id.

Davis singled out the Waterstone Transaction in his analysis because he believed it was the "most credible comparator available from H&H's resale history."  Id. (ECF No. 80-4, at 4).  He examined many transactions but selected the Waterstone Transaction as his closest comparator.  Id.  In forming his opinion, Davis chose not to rely on a different transaction involving the sale of gloves because it was a "small-scale transaction just north of $3,500 in value," so the "gross margin H&H earned from that transaction," a substantial 28%, "is not an appropriate comparator . . . ."  Id.; see also Davis Dep. 89:15-90:8 (explaining that generally as the volume of the transaction increases, the gross profit margin decreases).  Overall, Davis's gross profit margin opinion is rooted in data from H&H's business practices and industry sources, and is therefore admissible.

This Court recognizes that Davis's testimony is not perfect.  But these flaws do not render otherwise admissible expert testimony inadmissible.  Shaky but admissible evidence can always be attacked through "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ."  Daubert, 509 U.S. at 596.  Nonetheless, given Davis's reliance on financial reports, H&H's financials, and his own experience, the reasoning underlying his proffered opinion is reliable, and his opinion as to the gross profit margin of a resale transaction may be relevant to facts at issue.[1]  As such, Davis is permitted to testify as to what a reasonable gross profit margin would have been for a resale transaction involving the sale of goods like the Halyard gloves.  Additionally, based on his familiarity with the H&H distributorship agreement

---

[1] Among defenses raised by ADG to the merits of H&H's claim is an argument that H&H was never contemplated as a reseller of the Halyard gloves and thus a resale gross margin would be irrelevant.  The relevance of gross margin testimony is raised in other pleadings, and in ruling that Davis's opinion on gross margins is reliable, the question of its relevance is reserved for the presiding judge.

with Halyard, Davis can describe additional compensation H&H would have earned, to the extent that testimony is deemed relevant at trial.

**B.      Testimony About the Gross Profit Margin as it Relates to a Finder's Fee and ADG's Expectations in Entering into the NDA.**

Regarding Davis's finder's fee conclusion, ADG asserts that this opinion should be excluded because it is based on an improper and unsupported assumption that the 11.4%-13.4% gross profit margin would be applicable to two different types of transactions, "whether the ultimate transaction was (a) a resale transaction in which H&H purchased nitrile gloves from Halyard and resold them to ADG or (b) if ADG purchased nitrile gloves directly from Halyard and H&H would have received some sort of finder's fee."  Def.'s Mem. (ECF No. 80, at 14).  ADG also argues that this Court should exclude any testimony Davis provided speculating as to what ADG's expectations would have been or were concerning the NDA because Davis provided no analysis or independent basis in reaching this conclusion.  Id. at 23-24.  I agree with both points.

After arriving at his opinion on gross margin and without any reliable explanation, Davis equated the gross profit margin for a resale transaction and for a transaction involving a finder's fee, failing to distinguish between each type of transaction.  See id. (ECF No. 80-2, at 2).  Davis does not have any cited basis to conclude that a finder's fee would have been calculated in the same way as a resale gross profit margin estimate.  Further, Davis cannot testify that in entering the NDA, ADG would have expected to pay H&H any finder's fee, much less what that finder's fee would have been.  See id. (ECF No. 80-2, at 3).  This testimony is unsupported by data or Davis's relevant experience.  Because Davis put forth such assertions with no independent analysis and with insufficient support, Davis is precluded from testifying that a 11.4%-13.4% gross profit margin would apply to a finder's fee, or that ADG would have expected to pay H&H a finder's fee of any kind in entering into the NDA.

18

## IV.   **CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's

Motion in Limine to Exclude Testimony of Plaintiff's Damages Expert Roland Davis.  (ECF No.

79).

IT IS SO ORDERED.

_____ /s/

Douglas E. Miller

___United States Magistrate Judge_____

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 6, 2024